**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **MAR-CHEK, INC. et al.,** | * |
| Plaintiffs, | * |
| v. | *     Case No.: GJH-18-3765 |
| **MANUFACTURERS AND TRADERS TRUST COMPANY et al.,** | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiffs Mar-Chek, Inc. and Mar-Chek II, Inc. (collectively, "Mar-Chek" or "Plaintiffs") initiated this case in the Circuit Court for Anne Arundel County asserting a number of state law claims. ECF No. 1. After Plaintiffs stipulated to the dismissal of a non-diverse party, the remaining Defendants Manufacturers and Traders Trust Company and M&T Bank Corporation (collectively, "M&T") and Branch Banking and Trust Company ("BB&T") filed a Notice of Removal. *Id.* Pending before the Court is Plaintiffs' Motion to Remand or for Leave to Amend Complaint, ECF No. 30, and Defendants' Motions to Dismiss, ECF Nos. 45 & 49. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Plaintiffs' Motion to Remand or for Leave to Amend will be denied, and Defendants' Motions to Dismiss will be granted.

**I.     BACKGROUND**

   **A. Factual Background[1]**

Plaintiffs operate multiple "Checkers" fast food restaurants throughout Maryland. ECF No. 1-2 ¶ 16. Prior to 2007, Mar-Chek hired Mitul B. Shah to perform bookkeeping services. *Id.* ¶ 17. Shah was eventually promoted to be Mar-Chek's Chief Financial Officer. *Id.* However, Shah was not authorized to sign checks. *Id.* Rather, Keith A. Martin, Mar-Chek's owner and President, was the only person authorized to sign checks or transfer Mar-Chek funds. *Id.* ¶¶ 16–17.

In February 2007, Shah opened bank accounts in the name of Mar-Chek, Inc., at Provident Bank ("Provident"). *Id.* ¶ 18. Provident employed Christina Stroud, later Christina Cooper ("Stroud"), as a bank teller and teller manager. *Id.* Stroud was involved in a romantic relationship with Shah, and she processed the opening of the Mar-Chek account for Provident. *Id.* To open the account, Shah completed and executed paperwork that falsely represented that he was authorized to open the account and take actions on behalf of Mar-Chek with regard to the account. *Id.* ¶¶ 19-24.

Shah completed and executed a form provided by Provident that was entitled "Resolution for Corporate Deposit Account." *Id.* ¶ 19. The Resolution falsely stated that Mar-Chek authorized Shah to act on behalf of Mar-Chek in all respects concerning the account. *Id.* ¶ 20. The Resolution listed Martin, who was identified under the title "President," and Shah, who was identified under the title "Authorized Signer," as the only individuals who were purportedly authorized to sign checks on behalf of Mar-Chek. *Id.* ¶ 21. The Resolution represented that the person signing it was the Secretary of Mar-Chek, but only Shah signed the document, under a

---

[1] Unless otherwise stated, the background facts are taken from Plaintiffs' Complaint, ECF No. 1-1, and are presumed to be true.

line marked as "Other Officer." *Id.* ¶¶ 19, 21. Shah's title was not listed, although the form required that it be listed. *Id.* ¶ 21.

Martin never authorized Shah to be an authorized signatory or act on behalf of Mar-Chek concerning any bank account. *Id.* ¶ 22. Shah also was never the Secretary or other officer of Mar-Chek, and Provident knew that, because it had Mar-Chek's Articles of Incorporation, which did not identify Shah as the Secretary or other officer of Mar-Chek. *Id.* ¶ 19.

Shah also opened a Commercial Signature Card. Martin did not sign the card, was not present at Provident while the account paperwork was processed, and did not authorize Shah to sign on his behalf. *Id.* ¶¶ 23, 25. However, Shah signed Martin's name to obtain the card and claimed that he was an authorized signatory for the account. *Id.* The Signature Card listed "Christina Stroud" as the "Branch Representative" who processed the Signature Card. *Id.* Stroud and Provident had the Articles of Incorporation in their possession but made no attempt to verify the signatures on the account opening paperwork or to contact Martin or anyone at Mar-Chek (other than Shah) regarding the account opening paperwork. *Id.* at ¶ 24. A cursory comparison of Martin's signature on the Articles of Incorporation with his purported signature (actually forged by Shah) on the Signature Card would have revealed that the signature on the Signature Card was not Martin's. *Id.*

To open the account, Stroud was required to obtain supporting documentation and verify that she completed a Commercial Account Opening Checklist. *Id.* at ¶ 26. The Checklist required employees to secure approvals for all authorized signers, verify the identification of all account holders, and obtain an authorized signer verification form. *Id.* Stroud falsely represented on the Checklist that she performed these tasks, even though she did not. *Id.* The "Operations" department was required to verify the documentation, and the Checklist includes another set of

initials for the Operations employee who purportedly performed this verification, but no such verification was performed. *Id.* at ¶ 28. Additionally, the branch manager was required to approve the account paperwork, but the space where the branch manager is required to be identified is blank, indicating that the branch manager never approved the paperwork. *Id.*

Once Shah opened the account and added himself as a signatory who could act on the account's behalf, he wrote and personally endorsed checks from the Mar-Chek accounts to himself and others and sent electronic/wire transfers for his personal benefit without Mar-Chek's authorization. *Id.* ¶ 30. Shah concealed the payments in Mar-Chek's accounting software by posting them as a reduction to accounts payable to appear as if vendor invoices were being paid and also as a reduction to a fictitious payroll account. *Id.* at ¶ 35. In addition, Shah and his father began making loans to Mar-Chek, which Shah recorded on the Mar-Chek accounts as a liability, but did not record repayments as a reduction of the loan/liability. *Id.*

In 2009, the Provident/M&T accounts were closed, and Shah opened four bank accounts on behalf of Mar-Chek at BB&T and then added himself as a signatory on the accounts. *Id.* at ¶ 32. Martin did not execute any account initiation or modification paperwork with BB&T to include Shah as a signatory on the account. *Id.* ¶ 34. Shah wrote and personally endorsed checks from the accounts to himself and others and sent electronic/wire transfers for his personal benefit, without the authorization of Mar-Chek. *Id.* BB&T failed to follow its operating procedures and/or prevailing banking standards in permitting Shah to add himself to the accounts as a signatory with the authority to transmit funds through electronic/wire transfers, despite the fact that he was not an officer of the corporation. *Id.* ¶ 32.

In May 2013, Shah moved three operating and payroll accounts of Mar-Chek from BB&T back to M&T. *Id.* at ¶ 40. Stroud remained employed by M&T as a Teller Manager and

remained personally involved with the Mar-Chek accounts. *Id.* In the process of re-opening accounts with M&T, Shah completed and executed forms provided by M&T entitled "Certified Banking Resolutions of Corporation." *Id.* at ¶ 41. The Resolutions stated, among other things, that Mar-Chek duly approved resolutions to open the accounts at M&T and that Shah was authorized to open the accounts and act on Mar-Chek's behalf. *Id.* The Resolutions contained Martin's purported signatures, but the signatures were not originals; instead they were stamped replicas. *Id.*

Martin never authorized Shah to add himself as a signatory on the Mar-Chek accounts, and he never signed the Resolutions or authorized anyone to execute the Resolutions on his behalf or stamp his signature on the Resolutions. *Id.* Martin was never present at M&T, and no one at M&T made any attempt to contact Martin or verify his signature or that he authorized the Resolutions. *Id.* Moreover, M&T knew that Shah was not authorized to open the accounts or submit the Resolutions, because it had the Articles of Incorporation for Mar-Chek, which did not identify Shah as an authorized officer or Board member of Mar-Chek. *Id.*

Also without authorization from Martin, Shah submitted to M&T forms entitled "Commercial Deposit Account Opening Request." *Id.* at ¶ 42. Shah then wrote and personally endorsed checks from the Mar-Chek accounts to himself and others and sent electronic/wire transfers for his personal benefit, without the authorization of Mar-Chek. *Id.* at ¶¶ 45-51. In some instances, Shah again concealed the payments in Mar-Chek's accounting software by posting them as a reduction to accounts payable and as a reduction to a fictitious payroll account. *Id.* at ¶ 46. Many of the payments were purportedly repayments of loans, but the loan liability was never reduced and remained inflated. *Id.* Shah also noted "salary" or "payroll" in the memo section of checks he wrote from Mar-Chek's accounts, but these checks were not legitimate or

authorized payroll checks and were never included in the company payroll reports for the respective periods. *Id.* at ¶ 48. Stroud personally facilitated wire transfer transactions while employed by M&T that were initiated by Shah. *Id.* at ¶ 44.

In 2015, Martin moved the Mar-Chek bank accounts to Bank of America, where Shah was unable to secure signatory or wire transfer authority. *Id.* at ¶ 4. As a result, Shah began improperly processing additional payroll checks to himself, which was detected by the payroll company that Mar-Chek used to process payroll. *Id.* On July 30, 2015, the payroll company advised Martin of the questionable payroll transfers to Shah, and the next day, Martin terminated Shah. *Id.* A criminal investigation of Shah ensued, during which authorities uncovered Shah's fraudulent actions with regard to Mar-Chek's bank accounts. *Id.* at ¶ 5. In all, from 2007 until 2015, Shah improperly transferred in excess of $2 million from Mar-Chek accounts and caused in excess of $1.5 million in damages to Mar-Chek. *Id.* at ¶ 6.

### B. Procedural Background

On February 15, 2017, Shah filed suit against Mar-Chek in the Circuit Court for Baltimore County, Maryland alleging that he and his family members had extended a number of loans to Mar-Chek that were never repaid. ECF No. 33-1. On July 6, 2017, Mar-Chek filed a Counterclaim against Shah, asserting that Shah misappropriated funds from Mar-Chek. *Id.* On July 26, 2018, Mar-Chek commenced this action against the Bank Defendants and Christina Stroud in the Circuit Court for Anne Arundel County. ECF No. 1-2. Stroud filed an Answer. ECF No. 20-25. M&T moved to dismiss for failure to state a claim upon which relief can be granted. ECF No. 21-6. BB&T moved to dismiss or, in the alternative, for summary judgment. ECF No. 21-7.

Shortly after the Anne Arundel County Action was filed, counsel for the parties engaged in discussions concerning the potential transfer of the Baltimore County Action to Anne Arundel County for consolidation purposes. ECF No. 30-6. The Defendants were amenable to consolidating the cases in some fashion if and when the Baltimore County Action was transferred to Anne Arundel County. *Id.* However, at the time, the Bank Defendants were unaware that Mar-Chek planned to dismiss Cooper as a defendant in the Anne Arundel County Action. ECF No. 33 at 7. On November 29, 2018, Mar-Chek and Stroud, a Maryland citizen, filed a Stipulation of Dismissal. ECF No. 30-15. The remaining Defendants then filed a Notice of Removal based on diversity jurisdiction. ECF No. 1. Both Mar-Chek entities are Maryland citizens. *Id.* ¶ 4. BB&T is a citizen of the State of North Carolina. *Id.* ¶ 5. M&T is a citizen of the State of New York. *Id.*

Mar-Chek then filed a Notice of Withdrawal, purporting to withdraw the Stipulation of Dismissal. ECF No. 16. The Bank Defendants jointly opposed the Notice of Withdrawal, ECF No. 25, arguing that because Mar-Chek was effectively trying to add Stroud as a party defendant, it was required to file a motion to amend its Complaint pursuant to Federal Rule of Civil Procedure 15. Defendants noted in their opposition that Mar-Chek's counsel had assured Stroud's counsel that wherever the case is litigated, all claims against Stroud would ultimately be dismissed. *Id.* at 8. Stroud's purported consent to Mar-Chek's Notice of Withdrawal substantiates the existence of this agreement. ECF No. 16 at 3. Further, Mar-Chek has not disputed that it has assured Stroud that it will not litigate its claims against her. Mar-Chek filed its Motion to Remand or Motion for Leave to Amend on December 21, 2018. ECF No. 30.

## II. DISCUSSION

### A. Motion to Remand

"On a motion to remand, the court must 'strictly construe the removal statute and resolve all doubts in favor of remanding the case to state court,' indicative of the reluctance of federal courts 'to interfere with matters properly before a state court.'" *Ali v. Giant Food LLC/Stop & Shop Supermarket Co.*, 595 F. Supp. 2d 618, 620 (D. Md. 2009) (quoting *Richardson v. Phillip Morris Inc.*, 950 F. Supp. 700, 701–02 (D. Md. 1997)). The removing party "bears the burden of proving that removal was proper." *Marchese v. JP Morgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 459 (D. Md. 2013) (citations omitted). "[B]ecause of the 'significant federalism concerns' implicated by divesting a state court of jurisdiction, removal jurisdiction is strictly construed." *Stephens v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.*, 807 F.Supp.2d 375, 378 (D. Md. 2011) (quoting *Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir.1994)).

"[I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).

Maryland Rule 2-506(a) allows "a party who has filed a complaint" to "dismiss all or part of the claim without leave of court by filing (1) a notice of dismissal at any time before the adverse party files an answer or (2) a stipulation of dismissal signed by all parties to the claim being dismissed." Md. R. 2-506(a). Dismissal of parties or claims may also be accomplished these ways:

> **(b) Dismissal Upon Stipulated Terms.** If an action is settled upon written stipulated terms and dismissed, the action may be reopened at any time upon

8

>request of any party to the settlement to enforce the stipulated terms through the entry of judgment or other appropriate relief.
>
>**(c) By Order of Court.** Except as provided in section (a) of this Rule, a party who has filed a complaint, counterclaim, cross-claim, or third-party claim may dismiss the claim only by order of court and upon such terms and conditions as the court deems proper. If a counterclaim has been filed before the filing of a plaintiff's motion for voluntary dismissal, the action shall not be dismissed over the objection of the party who filed the counterclaim unless the counterclaim can remain pending for independent adjudication by the court.

Md. Rule 2-506.

Here, Mar-Chek and Stroud filed their Stipulation of Dismissal pursuant to "Maryland Rule 2-506(a)." ECF No. 30-15 at 2. Thus, the Stipulation of Dismissal triggered a new removal deadline by serving as an "other paper" from which it could "first be ascertained that the case" had "become removable" through the dismissal of the only non-diverse Defendant.

Mar-Chek's argument that Stroud remains a party to this case because the Circuit Court had not entered an order confirming her dismissal at the time of removal fails. By the rule's plain language, "a plaintiff may voluntarily dismiss a complaint in one of three ways: by a notice of dismissal, by a stipulation of dismissal, or by court order." *Wilcox v. Orellano*, 443 Md. 177, 182 (2015). Thus, no judicial act is required for a stipulation of dismissal to become effective when, as here, it is filed pursuant to Maryland Rule 2-506(a). *See also Garlock, Inc. v. Gallagher*, 149 Md. App. 189, 209, 814 A.2d 1007, 1018 (2003) (reversing trial court's treatment of stipulation of dismissal as nullity, where stipulated dismissal was reached during jury deliberations).

To support its position that a party is not dismissed from a case for removal purposes until a state court enters an order docketing the dismissal of the party, Mar-Chek cites *Grubb v. Donegal Mutual Insurance Co.*, 935 F.2d 57 (1991). That case, however, involved interpretation of Maryland Rule 2-506(b) (now Maryland Rule 2-506(c)), not Maryland Rule 2-506(a), the rule relevant here. Thus, when the Fourth Circuit concluded in *Grubb* that dismissal of non-diverse

defendants was not effective and the case not removable "until the dismissal order was entered on the docket" pursuant to Maryland Rule 2-506(c), it said nothing about whether dismissal is effective when no judicial action is required pursuant to Maryland Rule 2-506(a). *Id.* at 59. Accordingly, *Grubbs* is inapposite to this case and does not support Mar-Chek's position.

Mar-Chek also argues unconvincingly that Stroud was a party to this case at the time of removal because Mar-Chek filed a withdrawal of the Stipulation of Dismissal. ECF No. 16. However, that purported withdrawal was filed after Defendants' Notice of Removal and is not the proper mechanism for re-joining Stroud as a party to this suit. *Compare* Md. Rule 2-506(b) (allowing the parties to reopen an action at any time upon request to enforce stipulated terms through the entry of judgment or other appropriate relief) *with* Md. Rule 2-506(a) (not providing a similar mechanism for withdrawal of a stipulation of dismissal); Fed. R. Civ. P. 15(a) (requiring parties to seek leave of court to amend pleadings once twenty-one days have elapsed after service of a motion to dismiss pursuant to Rule 12(b)).

In the alternative, Mar-Chek has moved for leave to amend its complaint to restore Stroud as a party. ECF No. 30. 28 U.S.C. § 1447(e) provides: "[i]f after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." The Fourth Circuit has cautioned that "[e]specially where, as here, a plaintiff seeks to add a nondiverse defendant immediately after removal but before any additional discovery has taken place, district courts should be wary that the amendment sought is for the specific purpose of avoiding federal jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 463 (4th Cir. 1999). The Court's discretion is guided by "the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether the plaintiff has been dilatory in asking for amendment, whether the plaintiff will be

significantly injured if amendment is not allowed, and any other factors bearing on the equities." *Id.* at 462–63 (internal citations omitted).

Here, Mar-Chek's sole purpose in seeking to re-join Stroud is to destroy complete diversity such that remand is appropriate and consolidation of the Baltimore County Action and this case may be completed. Although Mar-Chek may not be asking for an amendment as a dilatory tactic, the Court notes that Mar-Chek could have sought to join the Bank Defendants in the Baltimore County Action long ago. Thus, the Court is unmoved by Mar-Chek's position that it is desperate to consolidate this action with the remaining state court suit. After all, Mar-Chek is the plaintiff, the master of its own Complaint, and was under no obligation either to file a separate suit against the Bank Defendants rather than join them in the Baltimore County Action or to stipulate to the dismissal of Stroud, the non-diverse Defendant. Finally, Mar-Chek will not be significantly injured if amendment is not allowed because it may still re-file a case against Stroud or move to join Stroud in the Baltimore County Action. It likely will not do so because it has conceded that it does not plan to actually litigate claims against Stroud. Instead, Mar-Chek's counsel represented to Stroud's counsel that wherever the case is litigated, all claims against Stroud will ultimately be dismissed. ECF No. 25 at 8. All of these facts point towards a conclusion that the only purpose in seeking to add Stroud is to destroy diversity. Thus, the Court will not allow Mar-Chek to re-join Stroud and Mar-Chek's Motion to Remand or for Leave to Amend will be denied.

### B. Motions to Dismiss

Satisfied that remand is improper, the Court next analyzes Defendants' motions to dismiss. When deciding a motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," and "draw all reasonable inferences in favor of the

11

plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435. 440 (4th Cir. 2011) (citations and internal quotation marks omitted). Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But to survive a motion to dismiss invoking Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662. 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544. 570 (2007)). The factual allegations must be more than "labels and conclusion . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint will not survive Rule 12(b)(6) review where it contains "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *See id.* at 679 (citing Fed. Rule Civ. Proc. 8(a)(2)).

     The Defendants move to dismiss Plaintiffs' claims, arguing that Mar-Chek's state law breach of contract and negligence claims are preempted by the Uniform Commercial Code (UCC). According to Defendants, once Plaintiffs common law claims are construed properly as UCC claims, they are time barred by a five-year statute of limitations.

     The UCC preempts common law claims when it provides an adequate alternative remedy. Md. Code Ann., Com. Law § 1-103. Section 3-401 states that "a person is not liable on an instrument [unless] the person is represented by an agent or representative who signed the

instrument and the signature is binding on the represented person under [Section 3-402 of the UCC]." *Id.* § 3-401. Section 3-402 provides that an instrument executed on behalf of a principal by an agent is enforceable against the principal only if it contains an "authorized signature." *Id.* § 3-402. The reverse principle that "an unauthorized signature" is ineffective is codified in § 3-403. *See* Official Comment 2 to Section 403 (observing that Section 3-403 sets forth the "generally accepted rule that the unauthorized signature . . . is wholly inoperative as that of the person whose name is signed."). Under the UCC, a signature is unauthorized if it is made "without actual, implied, or apparent authority." *Id.* 1-201(41).

Pursuant to Section 4-401 of the UCC, if a payor or drawee bank makes payment on a check that is not properly payable under Section 3-401 because it was endorsed by an unauthorized person, the bank may be held strictly liable for the unauthorized payment. Md. Code Ann., Com. Law I § 4-401. Similar rules apply to wire transfers. Md. Code Ann., Com. Law §§ 4A-104. Pursuant to Section 4A-202, a wire transfer initiated by a bank customer is authorized, as a general matter, if "the person authorized the order or is otherwise bound by it under the law of agency." Md. Code Ann., Com. Law § 4A-202. The "receiving bank" or the bank that makes payment, may be held liable if it accepts a "payment order" in the name of its customer that was not properly authorized.

Section 4–401(a) of the Commercial Law Article provides that "[a] bank may charge against the account of a customer an item that is properly payable from that account.... [A]ny item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank."

Here, Mar-Chek asserts various common law claims that turn on harm suffered because the Defendants honored transactions (either by check or by wire) that were initiated by an

unauthorized person. Articles 3, 4, and 4A of the UCC therefore provide an adequate remedy for the damages Mar-Chek allegedly incurred when the Defendants allowed Shah to open accounts on Mar-Chek's behalf, personally endorse checks, and initiate wire transfers despite his lack of authorization to do so.

Mar-Chek's position that its common law claims relate only to the banks' conduct during the account openings, not the fraudulent checks or wire transfers, ignores that Mar-Chek's alleged damages arise solely from Shah's unauthorized endorsement of checks or initiation of wire transfers. Mar-Chek argues unconvincingly that the UCC does not provide it with an adequate remedy because the transactions performed by Shah in the Mar-Chek accounts appeared properly payable under the guidelines of the UCC. This conclusion is contradicted by the allegations in the Complaint. According to the Complaint, the Defendants failed to follow proper procedures and missed red flags when it allowed Shah to open accounts on Mar-Chek's behalf and add himself as an "authorized signer." ECF No. 1-2 ¶¶ 20–25. For example, on paperwork used to open an account with Provident, Shah forged Martin's signature, and a cursory comparison of Martin's purported signature on the paperwork with his actual signature on Mar-Chek's Articles of Incorporation, which Provident possessed, would have revealed that the signature discrepancies. ECF No. 1-2 ¶ 24. Once Shah opened the accounts and added himself as a signatory who could act on the account's behalf, he wrote and personally endorsed checks from the Mar-Chek accounts to himself and others and sent electronic/wire transfers for his personal benefit without Mar-Chek's authorization. *Id.* ¶ 30. Stroud, who was in a romantic relationship with Shah and working with him, personally facilitated the wire transfer transactions initiated by Shah while she was employed by Defendant M&T. *Id.* at ¶ 44. In sum, according to

the Complaint, the Defendants knew or should have known that checks personally endorsed by Shah and wire transfers initiated by Shah were not authorized.

Based on these facts, charges initiated by Shah against Mar-Chek's accounts were not "properly payable" from those accounts because they were not "authorized by the customer" or "in accordance with any agreement between the customer and bank." Md. Code Ann., Com. Law § 4–401(a). In fact, the charges could not have been in accordance with an agreement between Mar-Chek and the banks because Shah was allegedly not acting as Mar-Chek's agent when he opened the accounts or when he signed agreements with the banks on Mar-Chek's behalf. Similarly, when Shah personally endorsed checks from the accounts for his personal benefit, his signature was "unauthorized" because it was made "without actual, implied, or apparent authority." *Id.* §§ 3-403, 1-201(41).

Because UCC articles 3, 4 and 4A govern Mar-Chek's ability to seek recourse for the alleged damages it incurred from the Defendants' conduct, Mar-Chek's common law claims are preempted, and Defendants' Motions to Dismiss will be granted.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Remand is denied, and Defendants' Motions to Dismiss are granted. A separate Order shall issue.

Date: <u>July   11 , 2019</u>                                          <u>     /s/                                         </u>
                                                                                    GEORGE J. HAZEL
                                                                                    United States District Judge